UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

UNITED STATES OF AMERICA,

                    Government,
                                        DOCKET NO. 2:16-cr-21
vs.


DAVID KEL BALDWIN,

                    Defendant.
_____/


TRANSCRIPT OF ARRAIGNMENT AND DETENTION HEARING

BEFORE UNITED STATES MAGISTRATE JUDGE TIMOTHY P. GREELEY

MARQUETTE, MICHIGAN

September 15, 2016


Court Reporter:          Glenda Trexler
                         Official Court Reporter
                         United States District Court
                         685 Federal Building
                         110 Michigan Street, N.W.
                         Grand Rapids, Michigan 49503

Proceedings reported by audio recording, transcript produced by
computer-aided transcription.

```
 1   A P P E A R A N C E S:

 2   FOR THE GOVERNMENT:

 3       MR. PAUL LOCHNER
         UNITED STATES ATTORNEY'S OFFICE
 4       Citizens Bank Building, 2nd Floor
         1930 U.S. 41 W
 5       Marquette, Michigan 49855
         Phone:  (906) 226-2500
 6       Email:  Paul.lochner@usdoj.gov

 7   FOR THE DEFENDANT:

 8       MR. KARL NUMINEN
         NUMINEN, DeFORGE & MATHIEU, PC
 9       105 Meeske Avenue
         Marquette, Michigan 49855
10       Phone:  (906) 226-2248
         Email:  Karl@numinenlaw.com

11

12                        *   *   *   *   *

13                                Marquette, Michigan

14                                September 15, 2016

15                                1:57 p.m.

16                    P R O C E E D I N G S

17       THE COURT:  Good afternoon.  I would ask counsel to

18   place their appearance on the record, please.

19       MR. LOCHNER:  Good afternoon, Your Honor,

20   Assistant U.S. Attorney Paul Lochner on behalf of the

21   United States.

22       MR. NUMINEN:  Your Honor, Karl Numinen for the

23   defendant who is with me today at counsel table.

24       THE COURT:  I have this matter set for arraignment on

25   the Indictment that was filed on September 14th as well as a
```

1    detention hearing.  It's my intention to proceed with the

2    arraignment first.  Any objection?

3              *MR. LOCHNER:*  No, Your Honor.

4              *MR. NUMINEN:*  No objection.

5         *THE COURT:*  All right.  I would ask defendant and

6    counsel to approach the podium, please.

7              Mr. Baldwin, you have the right to remain silent.

8    You don't have to answer any questions put to you here in court

9    today or any questions put to you by law enforcement officials.

10   Any answers you give to such questions could be used against

11   you in this proceeding or in a prosecution for false statement

12   or perjury.

13             Do you understand that you have the right to remain

14   silent?

15        *THE DEFENDANT:*  Yes.

16        *THE COURT:*  During the course of this arraignment

17   I'll be explaining to you the charges against you, some of the

18   rights you possess, and you will be required to enter a plea.

19   Because I need to ask you some questions, I will have you

20   placed under oath at this time.

21        *THE CLERK:*  Raise your right hand, please.

22                       DAVID KEL BALDWIN

23             *(The oath was administered)*

24        *THE DEFENDANT:*  I do.

25        *THE COURT:*  Do you have any difficulty reading,

1  writing, or understanding English?

2      THE DEFENDANT:  No.

3      THE COURT:  Are you suffering from any physical or

4  mental problems today that would affect your ability to

5  understand what's occurring here in court?

6      THE DEFENDANT:  No.

7      THE COURT:  Have you taken any medications, drugs, or

8  alcohol that would affect your ability to understand what's

9  occurring here in court?

10     THE DEFENDANT:  No.

11     THE COURT:  You have the right to be represented by

12  an attorney throughout these proceedings.  That means any time

13  you come into court or any time you're questioned by law

14  enforcement officials, you have the right to have your attorney

15  present.

16     Do you understand that?

17     THE DEFENDANT:  Yes.

18     THE COURT:  You may hire your own attorney, or if

19  you're unable to afford one, the Court will appoint one to

20  represent you.

21     Do you understand that?

22     THE DEFENDANT:  Yes.

23     THE COURT:  You've got to speak up just a little bit.

24     THE DEFENDANT:  Yes.

25     THE COURT:  Maybe you can pull the mic, Mr. Numinen.

 1    There you go.  Thank you.

 2           Would you state your full name, please, and spell

 3    your last name.

 4           THE DEFENDANT:  David Kel Baldwin, Jr.,

 5    B-A-L-D-W-I-N.

 6           THE COURT:  Is Kel spelled K-E-L?

 7           THE DEFENDANT:  Yes.

 8           THE COURT:  All right, thank you.  Have you received

 9    a copy of the Indictment that was filed in this matter

10    yesterday?

11           THE DEFENDANT:  Yes.  Yes.

12           THE COURT:  And have you had an opportunity to review

13    that with your attorney?

14           THE DEFENDANT:  It's the same thing that we reviewed

15    with Ms. Matthew?  Yes.

16           THE COURT:  I can have that read into the record, or

17    you can waive the reading of the Indictment.

18           MR. NUMINEN:  My client waives the reading,

19    Your Honor.

20           THE COURT:  All right.  Count 1 charges you with

21    assault resulting in substantial bodily injury in violation of

22    18 U.S.C. § 113(a)(7), (b)(1), and (3), and 2266(7), 1151, and

23    1153.  That carries a maximum penalty of five years in prison

24    and/or a $250,000 fine, a period of supervised release of up to

25    three years, a period of probation of between one and

five years, and a mandatory special assessment of $100.  And restitution will be mandatory, meaning you would have to pay back for any injuries suffered by the alleged victim.

Do you understand the offense with which you're charged in Count 1 and the maximum penalty provided by law for that offense?

*THE DEFENDANT:*  Yes.

*THE COURT:*  In Count 2 you are charged with assault resulting in serious bodily injury in violation of 18 U.S.C. § 113(a)(6), (b)(2), 1151, and 1153, that carries a maximum penalty of 10 years in prison and/or a $250,000 fine, a period of supervised release of up to three years, a period of probation of between one and five years, a mandatory special assessment of $100, and you would be required to pay restitution.

Do you understand the offense with which you're charged in Count 2 and the maximum penalty provided by law for that offense?

*THE DEFENDANT:*  Yes.

*THE COURT:*  Finally, in Count 3 you are charged with assault with a dangerous weapon in violation of 18 U.S.C. § 113(a)(3), 1151, and 1153.  That carries the same maximum penalty as Count 2.

Do you understand the offense with which you're charged in Count 3 and the maximum penalty provided by law for

that offense?

        *THE DEFENDANT:*  Yes.

        *THE COURT:*  You'll be required to enter a plea to those three counts.  Now, there are four different ways you can plead to the charges.  You can plead not guilty, indicating you did not commit them.  You can plead guilty admitting you committed the offenses.  With the Court's permission, you could plead nolo contendere or no contest, and if you enter that type of plea, you would be found guilty.  Finally, you can stand mute today or refuse to enter a plea.  If you do that, I will enter a not-guilty plea on your behalf.

        Do you understand the different ways you can plead to the charges?

        *THE DEFENDANT:*  Yes.

        *THE COURT:*  And how do you wish to plead to the charges in the three-count Indictment?

        *MR. NUMINEN:*  My client stands mute.

        *THE COURT:*  Not-guilty pleas will be entered on behalf of the defendant with respect to the counts.

        I have a schedule for progression in this case.  It sets a motion deadline of October 27, initial pretrial conference October 31st, final pretrial conference December 5th at 10 a.m., and places it on a trial docket for December 15th.

        Any other matters for the Court with respect to the

1   arraignment?

2           *MR. LOCHNER:* No, Your Honor.

3           *MR. NUMINEN:* No.

4           *THE COURT:* All right. You can return to your seats.

5           How do you wish to proceed on the issue of the

6   detention hearing? Do you have witnesses?

7           *MR. LOCHNER:* I do.

8           *THE COURT:* Okay.

9           *MR. LOCHNER:* I guess my preference at least,

10  Your Honor, is I would like to -- I would like to start by

11  making a proffer of additional information that I don't believe

12  that Probation had when they drafted their report. And I would

13  like to reserve an opportunity to rebut any of the evidence

14  that's presented by the defendant.

15          *THE COURT:* All right. First, both counsel got a

16  copy of the pretrial report?

17          *MR. LOCHNER:* Yes.

18          *MR. NUMINEN:* Yes, Your Honor.

19          *THE COURT:* I got an update to that report orally

20  just indicating that Pretrial has been reviewing the arrest

21  records and gave me information regarding resisting arrest in a

22  number of those situations where he was arrested. Most

23  recently, I think it was 2014, in Lac Vieux Desert. So go

24  ahead.

25          *MR. LOCHNER:* Thank you, Your Honor. I would ask the

1   Court to take into consideration, of course, the information
2   that's contained in the Presentence -- or the Pretrial Services
3   Report regarding this particular case.

4          I would also proffer for the Court's attention that
5   the defendant's criminal history from the Lac Vieux Desert
6   tribe also involved his banishment from Lac Vieux Desert tribal
7   lands once in 19 -- approximately in May of 1991 for a period
8   of approximately five years and then the banishment was lifted.

9          In 1999 it appears he was convicted of one count of
10  disorderly conduct and two counts of assault and battery, and
11  part of the sentencing as a result, he was banished from
12  Lac Vieux Desert lands for 18 months at that point in time.

13         In 2011 he was convicted in tribal court of assault
14  with a deadly weapon, entry without breaking, and resisting an
15  officer in discharge of their duties and received a 12-month
16  delay of sentence.

17         And in 2015, June of 2015, he was convicted of two
18  counts of disorderly conduct and was sentenced to six months
19  probation, no alcohol, anger-management counseling, and alcohol
20  assessment.

21         In addition, as the Court has indicated, I provided
22  reports from the Lac Vieux Desert Tribal Police Department as
23  well as reports from the Chicago Police and the Waukesha,
24  Wisconsin, police.  We received reports, copies of reports from
25  some of the assaults with which the defendant had been charged

1    in Chicago.  At least one of those incidents in Chicago

2    involved his spouse.  The repeat report from the Waukesha

3    Police Department from 1997 also involved an incident involving

4    a spouse.  And there are -- I received 14 separate police

5    reports from the Lac Vieux Desert Police, and I'm presuming

6    that this is what was reviewed with the Court by U.S. Probation

7    where there are repeated incidents between 2002 and 2016 in

8    which the defendant was involved in assaultive behavior, was

9    either barred or banished from or not allowed to enter bars and

10   went in there and engaged in assaultive behavior, threatened

11   responding police, threatened to kill the responding police and

12   their family members, and resisted officers.  And had to be

13   at least on one occasion, if not more, had to be pepper sprayed

14   to try to bring him into compliance with what police officers

15   were asking him to do.

16          In addition to that, I do have four exhibits I'm

17   tendering, and I'm handing Mr. Numinen a copy of those.

18          Exhibits 1 and 2 reflect the condition of the alleged

19   victim listed in Counts 1 and 2 as she was found by the

20   Lac Vieux Desert Police and reflects, I think, to some degree

21   the nature of the injury sustained.  And 3 and 4 were pictures

22   of the defendant in his clothing that were taken after he was

23   taken into custody by the Lac Vieux Desert Tribal Police.

24          Also, Your Honor, I have a recording of an interview

25   that was done of the alleged victim of Counts 1 and 2.  I don't

know how well they will work because the audio is very faint
when she is talking, and we haven't had the chance to test out
the system in here.  It doesn't typically work when we bring
speakers in.  I've tried to plug it into the system.  But it's
also about 25, 30 minutes long.  So I can proffer what I think
the contents of that summary would be.

THE COURT:  Has Mr. Numinen had a chance to listen to
it?

MR. LOCHNER:  No, I don't believe so.

MR. NUMINEN:  I haven't had any of this.  No police
reports.  None of the hearsay that Mr. Lochner is getting into,
I have not been provided any of it.

THE COURT:  Okay.  Mr. Lochner, do you want to play
it?  Do you want to summarize it?  What do you want to do?

MR. LOCHNER:  You know, I guess, Your Honor, what I
would do is I would summarize it for the meantime, and I would
make it available.  Of course, if we want to review it -- if
there's any dispute about it, we can certainly review it.

Like I said, it may be difficult to do in the
courtroom setting because of the -- how faint the audio is at
times when you're listening.  But the essence of it is, again,
JPB, the alleged victim in Counts 1 and 2, was interviewed over
in the Marquette General Hospital.  She had been taken by the
Lac Vieux Desert Tribal Police to the Iron River Hospital.  Her
doctor there had her intubated because of her condition and had

1    her medevacked up to Marquette General Hospital.

2          She was interviewed on the 13th of August again at

3    Marquette General Hospital by agents from the FBI.  The sum and

4    substance of it was she would not consent to a release of her

5    medical records at the time or consent to provide a DNA sample.

6    She indicated that she remembered being at a friend's house

7    when the defendant found -- actually the alleged victim of

8    Count 3, AJJ's number on the phone she had been using.  The

9    defendant asked her about it.  JPB said she was trying to call

10    AJJ.  Said she shouldn't have been trying to do that.  She used

11    her friend's phone to do so.

12          She remembered another person and Mr. Baldwin

13    scuffling at the first residence before she ran over to AJJ's

14    house.  At AJJ's house she and the defendant started fighting

15    and AJJ and the defendant started fighting.

16          She was asked if the defendant hit her with any

17    objects or if he just used his fists, and she said he only used

18    his fists that she was aware of.  She did not remember how she

19    got to the ground outside AJJ's house.

20          She and the defendant have been getting along earlier

21    that day, and she never should have called AJJ's number.  And

22    she said that she and the defendant got into a fight and she

23    obviously lost.

24          She thought the defendant should be in jail or spend

25    time in jail but he shouldn't be railroaded.  And that's

1    essentially the sum and substance of that interview, which as I

2    indicated to the Court.

3         THE COURT:  All right.  Anything further?

4         MR. LOCHNER:  If I may have just a moment,

5    Your Honor.

6         Just one other thing.  We had the opportunity this

7    week to speak to a treating physician at Marquette General

8    Hospital who indicated in part that the injury that JPB

9    suffered included what he described as traumatic brain injury

10   as well as a fractured nose.

11        THE COURT:  First, Mr. Numinen, any objections to

12   Exhibits 1 through 4?

13        MR. NUMINEN:  Well, I know that the Rules of Evidence

14   are relaxed in these types of hearings.  I would object that

15   it's all hearsay and there's no foundation.  We don't know who

16   took the pictures, when they were taken, or any of the

17   circumstances surrounding them.  But, again, I understand the

18   Rules of Evidence are relaxed here.

19        THE COURT:  The exhibits will be received.

20        Do you have witnesses?

21        MR. NUMINEN:  I do.  I'll call Joette Pete-Baldwin.

22        THE CLERK:  If would you step right up here, please.

23   Raise your right hand.

24

25

1          JOETTE PETE-BALDWIN

2          *(The oath was administered)*

3          *THE WITNESS:*  Yes, I do.

4          *THE CLERK:*  Thank you.  You may be seated.

5          DIRECT EXAMINATION

6   *BY MR. NUMINEN:*

7   *Q.*   Ms. Baldwin, I'm going to ask you to state your name.  And

8   you're soft-spoken, so I'm going to ask you to speak up and

9   then spell your last name and describe the hyphenation.

10  *A.*   My name is Joette Pete-Baldwin.  P-E-T-E dash

11  B-A-L-D-W-I-N.

12  *Q.*   And what's your relationship to Mr. David Baldwin?

13  *A.*   I'm his wife.

14  *Q.*   How long have you been married?

15  *A.*   Twenty-six years.

16  *Q.*   And how many children do you have?

17  *A.*   We've been together 26.

18  *Q.*   Married 15?

19  *A.*   Yeah.

20  *Q.*   And how many children do you have together?

21  *A.*   Five.

22  *Q.*   Were you residing together at the time and date of this

23  incident that's been described?

24  *A.*   Yes, uh-huh.

25  *Q.*   And do you remember that evening?

1    *A.*    Partially.

2    *Q.*    It's my understanding that you had a medical episode.   And

3    let's make sure that we have the date of the incident.   This

4    says that it was on August 12th, 2016, in Gogebic County.

5    *A.*    Yes.

6    *Q.*    Okay.  So when I talk about the incident, that's the date

7    I'm going to talk about.  Okay?

8    *A.*    Okay.  Uh-huh.

9    *Q.*    Yes?

10   *A.*    Yes.

11   *Q.*    And were you with your husband on that day?

12   *A.*    Yes.

13   *Q.*    Where were you?

14   *A.*    We had gone to the casino and then to my cousin Tracy's

15   house.

16   *Q.*    Okay.  What's Tracy's last name?

17   *A.*    Pete.

18   *Q.*    And were you drinking alcohol?

19   *A.*    Yes.

20   *Q.*    Were there a lot of people there?

21   *A.*    Yes.

22   *Q.*    Describe for me the scene or the number of people where

23   you were at.

24   *A.*    There was about six to seven people there.

25   *Q.*    Was it a formal party for an event or an informal

1 gathering?

2 A.   Informal gathering.

3 Q.   Was your husband there?

4 A.   Yes.

5 Q.   At some point did you leave the party?

6 A.   Yes.

7 Q.   Where did you go?

8 A.   I went to Anthony's house.

9 Q.   How far away was that?

10 A.   Approximately two blocks.

11 Q.   And Anthony, is his last name Jackson?

12 A.   Yes.

13 Q.   Okay.  At some point did your husband then join you at

14 Anthony Jackson's house --

15 A.   Yes.

16 Q.   -- two blocks away?

17 A.   Yes.

18 Q.   Okay.  My understanding is that you had some kind of a

19 medical episode.  Can you tell the Court what happened?

20 A.   Yes.  When I went to leave, I apparently had a stroke.

21 Q.   What do you mean apparently?  Did you or did you not have

22 a stroke?

23 A.   Well, I just heard testimony that it was.

24 Q.   No, I don't want to -- what do you know?

25 A.   I know that I had a stroke.

1    Q.   Did you go to the hospital?

2    A.   Yes.

3    Q.   Were you diagnosed by a doctor?

4    A.   Yes.

5    Q.   Did the doctor tell you you had a stroke?

6    A.   Yes.

7    Q.   Did you have a stroke?

8    A.   Yes.

9    Q.   Okay.  Was the stroke caused in any fashion by

10   Mr. Baldwin?

11   A.   No.

12   Q.   Did he strike you?

13   A.   No.

14   Q.   Did he hit you?

15   A.   No.

16   Q.   Did he punch you?

17   A.   No.

18   Q.   Did he kick you?

19   A.   No.

20   Q.   Did he assault you in any fashion?

21   A.   No.

22   Q.   There's pictures now shown of you lying down --

23   A.   Yes.

24   Q.   -- looking in a semi-conscious state.  Was that -- what

25   was that due to?

1    *THE COURT:*  This picture?

2    *MR. NUMINEN:*  Yes.

3    *THE WITNESS:*  My broken nose.

4    Q.  *(BY MR. NUMINEN)*  Yes.  And how did you get a broken nose?

5    A.    I had flipped over the railing.

6    Q.    You flipped over the railing?

7    A.    Yes.

8    Q.    How did you flip over the railing?  What caused that to

9    happen?

10   A.    Because I didn't have any balance at all.

11   Q.    Did you go unconscious?

12   A.    Yes.

13   Q.    And then flip over the railing?

14   A.    Yes.

15   Q.    Did Mr. Baldwin --

16          *THE COURT:*  Wait, wait, wait, wait.  You asked her if

17   she went unconscious, she said "Yes," and then you asked her if

18   she flipped over the railing.  How would she know?

19   Q.  *(BY MR. NUMINEN)*  Let me -- Ms. Pete-Baldwin, how did you

20   end up on the ground like that?

21   A.    When I had lost my con -- what do you call that --

22   balance, I hit my face on the wall and then I went outside to

23   try to get outside and I flipped over the railing and hit the

24   concrete and David was helping me.  And he --

25   Q.    I need to interrupt you.  Who was helping you?

1  A.   David.

2  Q.   Your husband?

3  A.   Yes.

4  Q.   Was he assaulting you?

5  A.   No.

6  Q.   Okay.

7  A.   He had tried to dial for the ambulance and the police to

8  come, but my phone wouldn't work because the tribal government

9  had shut my phone off that day.

10 Q.   Okay.  Why did they shut your phone off?

11 A.   Because I was removed from the tribal council, I was the

12 vice chair, for reporting their activity.

13 Q.   You reported their activities to whom?

14 A.   To Zeke Fox, a reporter in New York, and to the FBI.

15 Q.   And in retaliation for that, they removed you?

16 A.   Yes.

17 Q.   Okay.  In fact, you've talked to legal counsel about a

18 whistleblower's claim, haven't you?

19 A.   Yes.

20 Q.   Okay.  And all this happened right before this incident?

21 A.   Yes.

22 Q.   Now, it's my understanding that your husband was charged

23 in tribal court with assaulting you, domestic violence.  Is

24 that accurate?

25 A.   Previous, yes.

1   Q.   And did you tell the authorities the same thing there that

2   you're telling me too?

3   A.   Yes.  Yes.

4   Q.   You have to wait for me to finish the question.

5   A.   I'm sorry.

6   Q.   Did you tell the authorities in tribal court the same

7   thing you're telling the judge in this court?

8   A.   Yes.

9   Q.   What happened to those charges?

10  A.   They were dismissed.

11  Q.   Did you have an attorney?  Or, excuse me, did Mr. Baldwin

12  have an attorney?

13  A.   Yes.

14  Q.   And through Mr. Baldwin's attorney, did you present to the

15  tribal court medical documentation that you had a stroke?

16  A.   Yes.  I had sent documents when I received the medical

17  reports.

18  Q.   Okay.  So your condition, was it the result of being

19  assaulted by Mr. Baldwin or the result of a stroke?

20  A.   A stroke.

21  Q.   All right.  Did you tell this FBI agency at the

22  government's table about this?

23  A.   About?

24  Q.   About having a stroke.

25  A.   Yes.

1   Q.   And did you explain that the charges in tribal court were

2   dismissed?  To this FBI agent.

3   A.   Yes.

4   Q.   So --

5   A.   Is that Mark Hoff?  That's who I spoke with.

6   Q.   Okay.  Have you ever spoken to Mr. Lochner?

7   A.   No.

8   Q.   And did you tell the federal government, the United States

9   Attorney's Office, that you had a stroke and this was a result

10  of a stroke, not being assaulted?

11  A.   Yes.

12  Q.   Who did you tell that to?

13  A.   Mark Hoff.

14  Q.   Okay.  To the FBI?

15  A.   Yes.

16  Q.   All right.  If Mr. Baldwin were to -- oh, by the way, did

17  Mr. Baldwin and Mr. Jackson get into a scuffle that night?

18  A.   I assume they did, because I should say not have called.

19  Q.   I don't want you to assume anything.  Did you see them get

20  into a scuffle?

21  A.   My former boyfriend.

22  Q.   Mr. Jackson is?

23  A.   Yes.

24  Q.   Okay.  Did you see them get into a scuffle?

25  A.   No.

1   *Q.*    Did you see any altercation or a fight between them?

2   *A.*    No.

3   *Q.*    Did you see Mr. Baldwin hit Mr. Jackson with any kind of a

4   weapon?

5   *A.*    No.

6   *Q.*    Did you see Mr. Baldwin with a weapon in his hands at all?

7   *A.*    No.

8   *Q.*    At any point in time did you see either one of them

9   brandish a weapon against each other?

10   *A.*    No.

11   *Q.*    Did you tell this to the police?

12   *A.*    Yes.

13   *Q.*    Okay. Do you believe, based on what you saw, your own

14   personal observations, that Mr. Baldwin assaulted Mr. Jackson?

15   *A.*    No.

16   *Q.*    Okay. Other than you, Mr. Jackson, and Mr. Baldwin, was

17   anybody else in that home when this incident took place?

18   *A.*    No.

19   *Q.*    Do you see Mr. Jackson in the court today?

20   *A.*    No.

21   *Q.*    Have you seen him since this incident?

22   *A.*    No.

23   *Q.*    Was he supposed to be in the courtroom, the tribal court,

24   at the domestic violence case?

25   *A.*    I would assume so. I'm told not to assume. But I did not

1  see him there.

2  *Q.*   Did he show up?

3  *A.*   No.

4  *Q.*   Did he ever testify against Mr. Baldwin?

5  *A.*   No.

6  *Q.*   At any point time in time did he ever make a statement

7  against Mr. Baldwin as far as you know?

8  *A.*   Not that I know of.

9  *Q.*   At any point in time has he ever filed any kind of claim

10  against Mr. Baldwin, any kind of lawsuit or anything?

11  *A.*   No.

12  *Q.*   Okay.  If Mr. Baldwin were to be released from this court

13  on bond, where would he live?

14  *A.*   In Bruce Crossing, Michigan.

15  *Q.*   Okay.  Are you -- is your family still living in the same

16  residence that you were on the date of this incident?

17  *A.*   Yes.

18  *Q.*   And are you making plans to move?

19  *A.*   Yes.

20  *Q.*   Why?

21  *A.*   Because the tribal politics is too hard on our family.

22  *Q.*   Where would you move?

23  *A.*   To Bruce Crossing.  And eventually I would like to move

24  within 50 miles of the reservation and that way I would still

25  be eligible for any meetings or anything that I would like to

1    attend.

2    *Q.*   Do you have a place in Bruce Crossing that you can go to?

3    *A.*   Yes.

4    *Q.*   Describe the residence for me, please.

5    *A.*   It's a small house that is empty, and it belongs to our

6    friend, and he said that we could stay there if we need to.

7    *Q.*   Is it sufficient to accommodate you, your husband, and

8    your kids?

9    *A.*   Yes.

10   *Q.*   And these kids are still living with you?

11   *A.*   Yes.

12   *Q.*   I see there's children in the courtroom today.  Are they

13   yours?

14   *A.*   Yes.

15   *Q.*   Okay.

16   *A.*   I have two children in school.

17   *Q.*   Mr. Baldwin has a criminal history from some time ago.

18   Are you aware of that?

19   *A.*   Of what?

20   *Q.*   His criminal history from --

21   *A.*   Yes.

22   *Q.*   Okay.  Has he had any recent episodes of assaultive

23   behavior towards you?

24   *A.*   No.

25   *Q.*   Are you aware of any kind of time where he's failed to

1    appear in court?

2    A.    No.

3    Q.    Are you aware of any time where he's violated any terms or

4    conditions of a bond order?

5    A.    No.

6    Q.    Are you aware of any time when he's violated the terms and

7    conditions of any probation order?

8    A.    No.

9    Q.    I see that he had a delay of sentence on his last charge

10   with the court.  Did he successfully complete that delay?

11   A.    Yes, uh-huh.

12   Q.    Yes?

13   A.    Yes.

14   Q.    Were the charges then dismissed?

15   A.    Yes.

16   Q.    So that's not a conviction.  Is that accurate?

17   A.    Correct.

18   Q.    Okay.  Can you think of the last time he might have had

19   any kind of a criminal conviction?  Are you aware?  Do you

20   know?

21   A.    I think in reference to 2014 when he had smacked a can, a

22   pop can off the bar at the casino and they charged him with

23   disorderly.

24   Q.    Okay.  Mr. Lochner, the Assistant United States Attorney,

25   made reference to various police reports and allegations of

1    various disruptive or assaultive conduct.

2        Has Mr. Baldwin been convicted, not just accused of but

3    convicted of any of these crimes recently?

4    *A.*    No.  No.  No.

5    *Q.*    Okay.  Do you believe that Mr. Baldwin has a substance

6    abuse or an alcohol problem?

7    *A.*    Yes.

8    *Q.*    And are you interested in working with him in getting

9    appropriate treatment?

10    *A.*    Yes.

11    *Q.*    Has he expressed an interest to you in that?

12    *A.*    Yes.

13    *Q.*    Pardon?

14    *A.*    Yes.

15    *Q.*    Okay.  And are you aware of any particular treatment that

16    might be available if he's released?

17    *A.*    No.

18    *Q.*    Okay.  Would he be eligible for treatment with the tribe?

19    *A.*    Yes.

20    *Q.*    Do you know, has he been subject to a banishment order

21    because of this incident?

22    *A.*    Yes.  Without any court hearing.  This is just all

23    hearsay.  A letter was apparently sent to all the tribal

24    membership indicating my removal and the banishment of my

25    husband in the same letter.

1   *Q.*   Okay.

2   *A.*   Without any court or anything.

3   *Q.*   I want to go back to your diagnosis by a medical doctor of

4   having a stroke.  Who diagnosed you?

5   *A.*   Iron River and Marquette.

6   *Q.*   Pardon?

7   *A.*   Iron River, Michigan, and Marquette, Michigan.

8   *Q.*   So in Iron River what was the medical facility that you

9   went to?

10   *A.*   I don't know the name of that place, but it's some

11   hospital.  And when I was in Marquette I --

12   *Q.*   Can I interrupt you?  Is it -- would it be the

13   Dickinson County Memorial Hospital?

14   *A.*   No.

15   *Q.*   No?  Okay.  I'm sorry to interrupt you.

16   *A.*   When I woke up in Marquette I had asked why am I here that

17   they couldn't take care of me at Iron River, and they told me

18   that I had a stroke.  So I demanded to see the paperwork, and

19   it did indicate a stroke.

20   *Q.*   Is there any indication by any doctor -- not any

21   assumptions that any of the rest of us are making -- has a

22   doctor told you that this stroke was caused by being assaulted

23   or from some other means?

24   *A.*   No, no one has ever told me that.

25   *Q.*   Do you believe that your stroke was caused by being

1    assaulted?

2    *A.*    No.

3    *Q.*    Has any medical person given you any reason to believe

4    that it was caused by being assaulted?

5    *A.*    No.

6    *Q.*    Okay.  Is there another explanation for you having a

7    stroke?  Medical explanation.

8    *A.*    Super stress and alienation at work and over my community

9    and working with the FBI and reporters from New York and the

10    CFPB and multiple federal agencies.

11    *Q.*    Okay.  Thank you.  I've finished my questions.

12                        CROSS-EXAMINATION

13    *BY MR. LOCHNER:*

14    *Q.*    Good afternoon, Ms. Baldwin.  You and I have never met or

15    spoke; is that correct?

16    *A.*    No.

17    *Q.*    All right.  You were describing for us that on August 12th

18    you had been to the casino; is that correct?

19    *A.*    Uh-huh.  Yes.

20    *Q.*    And in fact you met with some of your friends at the

21    casino?

22    *A.*    Yes.

23    *Q.*    And then you drove over to a place called the

24    Roadhouse Bar in --

25    *A.*    I don't drink and drive.

1    Q.    Okay.  Not you driving.

2    A.    Okay.

3    Q.    I mean you rode over to the Roadhouse Bar --

4    A.    Okay.

5    Q.    -- and some beer was purchased there.  Do you remember

6    that?

7    A.    Logan will not serve us there.

8    Q.    Okay.  Did you then go to Ms. Pete's house?

9    A.    I went to Ms. Pete's house.

10   Q.    All right.  And who were the people who were there?

11   A.    Paul Bronk, Tracy Petes, Dan Green, Jenny Petes, myself,

12   and Dave.

13   Q.    All right.  Do you know someone named Albert Pete?

14   A.    Yes.

15   Q.    Was he there too?

16   A.    I did not see him.

17   Q.    All right.  And how long were you at Ms. Pete's house?

18   A.    Approximately an hour.

19   Q.    And what were you doing while you were there?

20   A.    Dave and I were layin' on the couch.

21   Q.    You mentioned that you didn't have -- or your phone wasn't

22   working because it belonged to the tribe --

23   A.    Right.  Right.

24   Q.    -- and they had shut it off.  Is that correct?

25   A.    But the policy is if you're a tribal member or an employee

1    of a tribe, you have an option to pick a plan and they approach

2    you and ask you if you want to be a privies versus a tribe, and

3    they never did.

4    Q.    So your phone, the point being, you didn't have a working

5    phone when you were at Ms. Pete's house?

6    A.    Correct.

7    Q.    Did you borrow anybody's phone?

8    A.    No.  I had found a phone in the coach that we were layin'

9    on.

10   Q.    Okay.  So you found the phone at Ms. Pete's house?

11   A.    Yes.

12   Q.    Was that a land-line phone or a cell phone?

13   A.    A cell phone.

14   Q.    And tell us a little bit about being at the party.  Why

15   did you leave the party?

16   A.    Because I had used that phone and dialed Anthony's number,

17   and he told me to meet him, and I went to Anthony's house.

18   Q.    When you left Ms. Pete's house, had there been any kind of

19   an altercation that had taken place?

20   A.    From when David had asked me to see the phone and I told

21   him "I don't know whose phone this is."  And I called Tracy

22   trying to act like she called Anthony's number.  And her and

23   her boyfriend and several other men came and grabbed me and I

24   had left.

25   Q.    So let's back up a little bit.  Isn't it true that

1  Mr. Baldwin here hit you in the face while you were at

2  Ms. Pete's house?

3  A.   Can you repeat that?

4  Q.   Yes.  Isn't it true that the defendant here, your husband,

5  hit you in the face --

6  A.   No.

7  Q.   -- while you were at Ms. Pete's house?

8  A.   No.

9  Q.   And people came running over after you had been struck.

10  A.   No.

11  Q.   And Mr. Green grabbed onto -- Dan Green grabbed onto your

12  husband.

13  A.   I don't think that.  I had left.

14  Q.   And did Mr. Albert Pete grab onto your husband?

15  A.   I don't think so.

16  Q.   So you didn't see that?

17  A.   No.  I had left to Anthony's.

18  Q.   How long were you at Mr. Jackson's house?

19  A.   I do not recall.

20  Q.   A long time?  Short time?

21  A.   It depends on what you call a short time.

22  Q.   Okay.  Less than 30 minutes?

23  A.   It could be.

24  Q.   Not sure?

25  A.   No.

1    *Q.*    And what are you doing when you're over at Mr. Jackson's

2    house?

3    *A.*    Talking to him.

4    *Q.*    And where were you in the house at the time you were

5    talking to him?

6    *A.*    Um, in the kitchen area.

7    *Q.*    And does your husband come over?

8    *A.*    Yeah.

9    *Q.*    How do you know he's arrived?

10   *A.*    Because Anthony told me that he was there.

11   *Q.*    And then what happens?

12   *A.*    And then he opened the door for him.  And then I went to

13   leave and I had my stroke.

14   *Q.*    So when you're having this stroke, both Mr. Jackson and

15   your husband are standing there in the house?

16   *A.*    I think David just came to the door and Anthony had opened

17   the door.

18   *Q.*    So he is still standing outside?

19   *A.*    Yes.

20   *Q.*    So he never -- your husband never asks or makes it into

21   the house?

22   *A.*    Not that I know of.

23   *Q.*    So where is Mr. Jackson standing then?  Is he still -- is

24   he by the door?

25   *A.*    I do not -- I don't know.

1    Q.   And where were you when you initially had this stroke?

2    A.   In the kitchen area.  The kitchen is right by the door.

3    Q.   And how was that it that you knew that you were having a

4    stroke?

5    A.   Because my -- everything started going like dizzy.  And my

6    arms and my legs started hurting.  And then I tried to get

7    outside.  And then I had hit.  And then I got on the porch and

8    I hit the wall again.  When I went outside, I flipped over the

9    railing.

10   Q.   Okay.  Back up a little bit for me.  You said you were in

11   the kitchen area --

12   A.   Yeah.

13   Q.   -- when you first had this.  Were you seated or were you

14   standing?

15   A.   Standing.

16   Q.   Okay.  And then you sensed that you were having this

17   stroke?

18   A.   Yeah.

19   Q.   How far away are you from the door that you described that

20   Mr. Jackson has opened for your husband?

21   A.   From the first door or the second door?  There's two

22   doors.

23   Q.   Well, the door that your husband was at.

24   A.   How far in feet?

25   Q.   Yeah.

1  A.   I'd say from here to the desk.

2  Q.   To my desk here or to the end of --

3  A.   No, this --

4  Q.   -- this bench over here?

5  A.   This desk right here.

6  Q.   So maybe four feet?

7  A.   Yeah.

8  Q.   Is that a fair guess?

9  A.   Yeah.

10  Q.   So that's where you're standing?

11  A.   Yeah.

12  Q.   And then you have this -- you sense that you're having

13  this stroke.

14  A.   Uh-huh.

15  Q.   I'm sorry, you can't say "uh-huh." You have to say "yes"

16  or "no."

17  A.   Oh, I'm sorry.

18  Q.   That's all right. So you're about four feet away from the

19  door?

20  A.   Yes.

21  Q.   And you said you fell. Where did you fall?

22  A.   I don't know where I fell. I just know that I had fell

23  and that I got back trying to get my stability again and I just

24  was not myself.

25  Q.   Okay. So are you still close to the door? You said you

1   were about four feet away from the door.

2   A.   Uh-huh.

3   Q.   And you sense you're having a stroke.  And you said you

4   fell.  And did you get back up?

5   A.   I don't recall.

6   Q.   And you said -- then you said you went outside.

7   A.   Yeah.

8   Q.   Do you remember --

9   A.   I tried to get fresh air.  I just know that.

10  Q.   Did you go directly outside?

11  A.   Yeah, I tried to make it outside.

12  Q.   All right.  So when you fell inside, did you just -- did

13  you just fall on the floor?

14  A.   I don't know.

15  Q.   Then you got up.  Is that right?

16  A.   Apparently.  I just know I was trying to get help and

17  tried to get fresh air.

18  Q.   Okay.  So you went outside.  Is that right?

19  A.   Yeah.

20  Q.   Where is Mr. Jackson at this point in time?

21  A.   I don't know.

22  Q.   And where is your husband at this time?

23  A.   Um, I don't know.  All I know is that when I landed on the

24  ground I was calling for him, and he was trying to call the

25  ambulance and the police to come help and the phone wouldn't

1  work.

2  Q.  And what phone -- whose phone did he have?

3  A.  Mine.

4  Q.  So he has yours.  And that's a cell phone?

5  A.  Yeah.

6  Q.  When he's doing that, where is he standing?

7  A.  I don't know.

8  Q.  So you come outside, and what happens then?

9  A.  I just know I flipped over the railing.  The railing is

10  like this, and I flipped over the railing.

11  Q.  It's like a handicapped railing kind of thing?

12  A.  Yeah.  Yeah.  Yeah.  Yeah.

13  Q.  And then you flip over the railing?

14  A.  Yes.

15  Q.  Or -- you flip over the railing, not the frame.

16  A.  Yes.

17  Q.  And you land on the ground.

18  A.  Yes.

19  Q.  Okay.  Now, is that --

20      THE COURT:  I have to interrupt because I'm confused

21  by something.  You said your husband was using your phone to

22  try and call the ambulance and the police.

23      THE WITNESS:  Uh-huh.

24      THE COURT:  I thought you said your phone didn't

25  work.

1          THE WITNESS:  He didn't know my phone was shut off.

2          THE COURT:  Did it work or was it shut off?

3          THE WITNESS:  It was working at 1:30 that afternoon

4     until Ken Keeney, the tribal attorney, had called Purchasing

5     and told them to shut it off.  So then I had gone into the

6     council room to approach --

7          THE COURT:  How did your husband get your phone?

8          THE WITNESS:  Because it was in my purse with me.

9          THE COURT:  Well, how did he get it from you?

10         THE WITNESS:  I do not know.

11         THE COURT:  All right.  Go ahead.

12         MR. LOCHNER:  Thank you, Your Honor.

13    Q.    (BY MR. LOCHNER)  So this handicap ramp goes from the door

14    down a little ways --

15    A.    Yes.

16    Q.    -- right?  Where -- how far down there is it that you flip

17    over?

18    A.    I do not know.  All I know is I had a mark here that I had

19    flipped over the railing.

20    Q.    Okay.  Now, when you say you don't know, this is what I'm

21    trying to understand:  Are you aware and are you saying that

22    you know that you walked outside and you know that you flipped

23    over that railing because you remember that that happened, or

24    are you guessing that that's what happened?

25    A.    No, I know that that's what happened.

1    Q.    Because you remember?

2    A.    I was trying to get fresh air.

3    Q.    Okay.  And so you were walking your way out there?

4    A.    If you want to call it walking, yes.

5    Q.    Okay.  So -- as opposed to -- what I'm getting at, ma'am,

6    so you're not crawling on all fours, you're standing up on your

7    two legs?

8    A.    Right.

9    Q.    And you go outside and then you flip over the railing?

10   A.    Yes.

11   Q.    And which side of the railing is that as you're walking

12   out?

13   A.    I do not know.

14   Q.    And you land on the ground?

15   A.    Yes.

16   Q.    And -- so you land in that spot.  Do you move from that

17   spot?

18   A.    No.  I don't think so.  I don't know.

19   Q.    All right.  So to your recollection, when you fell over

20   and you landed in that spot, you never moved?  You didn't get

21   up and walk someplace else?

22   A.    The next thing I knew was the police were there with a

23   flashlight asking what happened.

24   Q.    Okay.  So that's the last --

25   A.    Saying "Something is wrong with your wife."

1  Q.   I want you to correct me if I've got this wrong.  So you

2  flip over the railing --

3  A.   Yes.

4  Q.   -- and you land on the ground, and then after that the

5  next thing you can really remember is the police coming --

6  A.   Yeah.  Yeah.

7  Q.   -- to check and see -- or doing something with the light

8  with your eyes?

9  A.   They were just shining, and I was like "I'm right here."

10  Q.   All right.  When you were found out on the lawn there --

11  A.   (Coughing).  Excuse me.

12  Q.   -- you had no clothing on from the waist up.

13  A.   Yeah.

14  Q.   Your bra was off.  Your shirt was off.

15  A.   Yeah.

16  Q.   How did that happen?

17  A.   David was trying to catch me on the railing.  So I was

18  trying to hide myself.

19  Q.   So he tries to catch you as you're falling over the

20  railing?

21  A.   Yeah.

22  Q.   And that's how your bra and your shirt came off?

23  A.   Yeah.  And then the police had given my bra to my

24  daughters and my shirt to my stepmother.  And then she said

25  they came to the hospital to ask her for the shirt back, and

1  she didn't know why -- or what -- it was on the floor of her

2  van with the dog, so she just told me she'd get it to them.

3  Q.   So you remember that the police were looking in your eyes

4  with a --

5  A.   I remember seeing the flashlight of the police.  It was

6  Georgie -- George Peterson.

7  Q.   Okay.  And what's the next thing you remember?

8  A.   Um, trying to pull out the -- the thing they put in your

9  mouth when you have a stroke so you don't swallow your tongue.

10  Q.   You had been intubated?

11  A.   Yeah, that's what it was.

12  Q.   All right.  And where were you when you were trying to

13  pull that out?

14  A.   I believe I was in the ambulance.  I'm not sure.  Maybe at

15  the hospital.  I don't know.

16  Q.   So what's the next thing you actually remember?  Where

17  were you the next time you remember anything?

18  A.   Marquette.

19  Q.   When you were treated in Iron River, did you ever speak to

20  the doctor?

21  A.   No.

22  Q.   So you were unconscious the entire time?

23        THE COURT:  Yes or no.

24        THE WITNESS:  I don't remember talking to a doctor.

25  Q.   (BY MR. LOCHNER)  All right.  So that doctor couldn't have

1   told you that you had suffered any kind of stroke.  Fair to

2   say?

3   *A.*   No, I said when I went to Marquette I asked why they had

4   me in Marquette and they couldn't take care of me at

5   Iron River.

6   *Q.*   And who was your doctor when you got to the hospital in

7   Marquette?

8   *A.*   I don't know.

9   *Q.*   Do you remember seeing a Dr. Joseph Jameson?

10  *A.*   I believe that's -- I remember I was at Marquette --

11  *Q.*   In Marquette.  Do you remember seeing Dr. Joseph Jameson

12  in Marquette?

13  *A.*   Um, no.  My memory is not as quick.

14  *Q.*   And did any doctor tell you that you had suffered a

15  stroke?

16  *A.*   Um, I had seen the paperwork.

17  *Q.*   Okay.  That wasn't my question, ma'am.  Did any doctor

18  tell you that you had suffered a stroke?

19  *A.*   Um, I don't remember talking to a doctor.

20  *Q.*   So you didn't talk to a doctor any of the time that you

21  were in Marquette General?

22  *A.*   I probably did.  I don't remember.

23  *Q.*   I just want to go back -- I want to go back to

24  Mr. Jackson's house just for one thing.  I think you said --

25  and I want you to correct me if I have this wrong -- I think

1    you said in response to one of Mr. Numinen's questions that you

2    broke your nose or you thought you broke your nose because you

3    hit your face on that railing, on that handicap ramp.

4    A.    I don't -- the railing?

5    Q.    Or when you -- or was it -- or were you saying when you

6    hit the concrete?

7    A.    I don't know when it was broke.  From which fall.

8    Q.    So you don't know?

9    A.    No.

10   Q.    And you remember two falls.  One inside the house and then

11   one when you went over the railing?

12   A.    There was about three.

13   Q.    Where was the third one?

14   A.    Once in the house at the front door, second at the porch,

15   and third outside.

16   Q.    Okay.  When you say the porch, where is that in

17   relationship to the door and that handicap ramp that you've

18   described?

19   A.    There is an enclosed porch and then there's a ramp from

20   the enclosed porch.  So there's one door here, one door here,

21   and then the ramp.

22   Q.    Okay.  Kind of like if it were longer, maybe -- this is my

23   term -- maybe like a really short little breezeway?  Like a

24   door, there's a little space, another door, and then that

25   second door leads to the outside, that's the handicap ramp, and

1    then a door and a there's a little space and then another door?

2    Is that kind of what you're describing as a porch?

3    *A.*    Yeah.

4    *Q.*    You spoke to the FBI while you were at Marquette General

5    Hospital, correct?

6    *A.*    Yes.

7    *Q.*    And you told them that -- they asked you for consent to

8    have your medical records; is that right?

9    *A.*    Yes, they wanted my DNA.

10   *Q.*    Right.  They wanted a DNA swab, correct?

11   *A.*    Right.

12   *Q.*    And you didn't want to give those to them, right?

13   *A.*    Right.  Right.  I told them I don't give my DNA to anyone.

14   It's a Native American thing.

15   *Q.*    You asked them if it would be detrimental if you released

16   your medical records to Mr. Baldwin, didn't you?

17   *A.*    Did I?  Is that what you're asking?

18   *Q.*    Yes.

19   *A.*    Not that I recall.

20   *Q.*    And did you tell them that you remembered being at Tracy's

21   house when your husband found Tony's number on the phone that

22   you had been using?

23   *A.*    I don't know.  I told Mr. Hoff and the two other gentlemen

24   he had that they sat there for an hour or two waiting for me to

25   wake up and I had a lot of pain medication.

1  Q.  And did you tell them that you had -- you were trying to

2  call Tony and you shouldn't have been trying to do that?

3  A.  Yeah.  Yes.  Sorry.

4  Q.  Do you remember telling them that Daniel Green and your

5  husband were scuffling before you ran into Tony's house?

6  A.  Over the phone, I believe.  Because Daniel would never

7  like would leave.  They were very good friends.

8  Q.  Well, Daniel Green was at the house, wasn't he?

9  A.  Yes.

10 Q.  And your husband was at the house?

11 A.  Was Tracy's husband.  My cousin Tracy's.

12 Q.  Right.  So he's at the house and your husband is at the

13 house.

14 A.  Yeah.  Yes.

15 Q.  So they wouldn't be scuffling over the phone there, would

16 they?

17 A.  That's the phone that I had found in the couch.

18         THE COURT:  I think she's saying that they were

19 having a physical scuffle over who had possession of the phone.

20 Q.  (BY MR. LOCHNER)  He was trying to get the phone?  Is that

21 what you're saying?

22 A.  Yes.  Yes.

23 Q.  All right.  And you said -- you told the FBI that at

24 Tony's house you and your husband started fighting.  Do you

25 remember that?

1  A.   No.

2  Q.   And you told them that then your husband and

3  Anthony Jackson started fighting.  Do you remember that?

4  A.   No.

5  Q.   You were asked if your husband had hit you with any

6  objects or if he just used his fists, and you said he only used

7  his fists that you were aware of.  Do you recall that?

8  A.   No, but I do recall them asking if there was any weapons,

9  and I had told them that I'm not aware of any weapons or had

10 seen any weapons.

11 Q.   And you told them that you and your husband had gotten

12 into a fight and you obviously lost.  Right?

13 A.   I don't remember that.

14 Q.   And you told them that you thought that he should be in

15 jail or spend time in jail but he shouldn't be railroaded,

16 right?

17 A.   Not that -- against me.  The way he was asking questions

18 and giving me information that there was an altercation.  I do

19 not know.

20 Q.   Have you spoken at any point in time to any of the doctors

21 who treated you about whether or not you had had a stroke?

22 A.   Um, I had.  They would send the documentation to my

23 supplemental insurance for documentation.  And the documents

24 that I received upon discharge indicated a stroke.  But I do

25 not recall speaking to a doctor.  But when I sent the documents

1    to the supplemental insurance, there's a physician's statement

2    that has to be signed by the doctor.  And as of today I don't

3    know if it has been done.  I know they wanted additional

4    information, which is what I have to finish today.

5    Q.   Now, do you recall an incident in May of 2016 between

6    yourself and your husband?

7    A.   Yes.

8    Q.   Do you remember calling the tribal police on the 29th of

9    May of 2016 and reporting that he had assaulted you?

10   A.   Yes.

11   Q.   And you talked to Officer Peterson on that day, right?

12   A.   Yes.  And it had to do with Anthony Jackson again.

13   Q.   And he asked you, that is Officer Peterson asked you if

14   you reported this domestic violence situation correctly and you

15   said that you did, right?

16   A.   If I made a statement and reported it or if what I told

17   him was correct?

18   Q.   That what you told them earlier --

19   A.   Because I never made a statement.

20   Q.   Do you remember going to the Lac Vieux Desert Tribal

21   Police Department to make that report?

22   A.   Yes.  They took --

23   Q.   So you made that report of the offense by going to the

24   tribal police station, walking in and telling them yourself?

25   A.   Yes.

1  Q.  And you told them that your husband had grabbed you by the

2  arm and pushed you to the ground and you showed them some

3  bruising on your left arm, correct?

4  A.  He was trying to carry me home because I was intoxicated

5  and I had come from Anthony's home.

6  Q.  Okay.  Ma'am, that wasn't what I asked you.  What I asked

7  you is what you said to the police.  You told the police that

8  he had grabbed you by the arm and pushed you to the ground and

9  you showed them bruising on the left arm -- on your left arm

10  and you told them that's from where your husband had grabbed

11  you and pushed you to the ground.

12  A.  I don't recall saying that.  I would have to see the

13  statement to Georgie.  I don't recall that.  Like I said, I was

14  intoxicated.

15  Q.  And Officer Peterson asked you if you had reported the

16  domestic violence situation correctly and you said that you did

17  but you did not want anything to happen to your husband.

18  A.  The police officer asked me if I reported it correctly?

19  Q.  Correct.  Officer Peterson.

20  A.  Did he know that?  I don't know.

21  Q.  That's not my question, ma'am.

22  A.  I don't understand.

23  Q.  He asked you whether you reported the domestic violence

24  incident correctly, and you told him that you did but you

25  didn't want anything to happen to your husband.

1    A.   Oh, I know what you're saying now.  If I reported my words

2    to him correctly.  Is that what you mean?

3    Q.   I'm asking you whether you said that to him.

4    A.   Yeah.

5    Q.   Did you tell him that that report you made was correct but

6    that you didn't want anything to happen to your husband?

7    A.   No, I didn't tell him that that was correct.  I told that

8    I was intoxicated and that I didn't want anything to happen to

9    my family.  I expressed concern for my children, because he --

10   Q.   So if he reported that, that's just simply false?  What he

11   said, it's false?

12        MR. NUMINEN:  Your Honor, I'm going to object that

13   the question is so vague the witness can't really even answer

14   that question.  If he reported that that's false?  I don't

15   think the witness even understands what "that" means.

16        THE COURT:  I'll sustain the objection.

17   Q.   (BY MR. LOCHNER)  If he said that you told him that the

18   report of the domestic violation -- the domestic violence

19   situation correctly but that you didn't want anything to happen

20   to your husband, would that be true or would that be false?

21   A.   No, he never asked me that.

22   Q.   Would it surprise you to learn that Dr. Joseph Jameson who

23   treated you at Marquette General Hospital told the FBI that you

24   didn't suffer a stroke?

25   A.   It would conflict with the statements I have.

1      **MR. LOCHNER:**  I have nothing further, Your Honor.

2  Thank you.

3          **THE COURT:**  Mr. Numinen.

4          **MR. NUMINEN:**  Thank you.

5                    REDIRECT EXAMINATION

6  *BY MR. NUMINEN:*

7  *Q.*   Ms. Pete-Baldwin, Mr. Lochner asked you several times

8  whether or not you told the FBI certain things.

9  *A.*   Uh-huh.

10  *Q.*   In fact, every time he asked the question he would say

11  "You told them that" and you told them that about a fight that

12  you think you lost and you said "I don't remember saying that."

13  *A.*   Uh-huh.

14  *Q.*   Is it more likely that the FBI was telling you these

15  things to try to get you to confirm them?

16  *A.*   Yes.

17  *Q.*   And the fact of the matter is, you weren't in a fight with

18  your husband that night, were you?

19  *A.*   That's correct.

20  *Q.*   Okay.  So each time Mr. Lochner says you told them that

21  there was a weapon, you're saying "No, they were telling me

22  that"?

23          **THE COURT:**  Wait, wait, wait, he didn't say you told

24  them there wasn't a weapon.

25  *Q.*   *(BY MR. NUMINEN)*  Well, the questions that Mr. Lochner was

1   asking you, they were all prefaced by the phrase "You told

2   them" such and such. Is it more likely that the FBI was

3   telling you those things?

4   *A.*   Yes.

5   *Q.*   Okay. Now I want to take you to that room. You were at

6   Marquette General Hospital, right?

7   *A.*   Yes.

8   *Q.*   And you had suffered a stroke, right?

9   *A.*   Yes.

10   *Q.*   You were unconscious for a while?

11   *A.*   Yes.

12   *Q.*   You came out of consciousness and you had police officers

13   there waiting for you.

14   *A.*   Yes.

15   *Q.*   Right out of consciousness they started asking you

16   questions.

17   *A.*   Yes.

18   *Q.*   You were blurry?

19   *A.*   Yes.

20   *Q.*   You were fuzzy-headed. Yes?

21   *A.*   Yes.

22   *Q.*   You weren't clear, right?

23   *A.*   Correct.

24   *Q.*   You were on pain meds?

25   *A.*   Yes.

1  Q.   And they were asking you questions about what had taken

2  place.

3  A.   Yes.

4  Q.   Are you blurry, fuzzy, and on pain meds now?

5  A.   No.

6  Q.   Are you clear now?

7  A.   Yes.

8  Q.   Are you telling the truth under oath?

9  A.   Yes, I am.

10  Q.   You said you filed an insurance claim over your injuries

11  in this case?

12  A.   Yes.

13  Q.   And in the insurance claim did you provide medical

14  documentation?

15  A.   Yes.

16  Q.   And in the medical documentation does it record the fact

17  that you had a stroke?

18  A.   Yes.

19  Q.   Mr. Lochner is asking you would it surprise you that

20  Dr. Jameson is saying that you did or did not have a stroke,

21  and you're saying that would be inconsistent with the records

22  that you saw?

23  A.   Yes.

24  Q.   Is Dr. Jameson in the courtroom today?  Do you see him?

25  A.   I -- no.

1   *Q.*   Okay.  When the FBI and these two other gentlemen were

2   interviewing you, were they taking notes?

3   *A.*   I don't recall.

4   *Q.*   Do you know if they were recording the interview?

5   *A.*   No.

6   *Q.*   Do you know one way or the other?

7   *A.*   No.

8   *Q.*   Okay.  Thank you.  I'm finished.

9         *THE COURT:*  Thank you.  You may step down.

10         Additional witnesses?

11         *MR. NUMINEN:*  I don't have any further witnesses.

12         *THE COURT:*  Proffer?

13         *MR. NUMINEN:*  Yes.  Your Honor, the -- this

14   allegation in this --

15         *THE COURT:*  First, proffer means do you have facts

16   you want to present in addition to that?  Not argument.  I'll

17   take argument next.  Additional facts that you wish to present.

18         *MR. NUMINEN:*  No, no additional facts I wish to

19   present, Your Honor.

20         *THE COURT:* All right.  Any rebuttal, Mr. Lochner?

21         *MR. LOCHNER:*  No, other than I will proffer that

22   Dr. Jameson said there was no indication that she had had --

23   that Ms. Pete-Baldwin had had a stroke when he was interviewed.

24         *THE COURT:* All right.  I'll take argument.

25   Mr. Lochner.

1      *MR. LOCHNER:*  Your Honor, it's the government's

2   position that the defendant should be detained in this matter.

3   He has a history of violent conduct.  He has a history of

4   violent conduct with his wife.  The nature of the injuries that

5   were sustained just don't add up.  When you compare

6   Ms. Pete-Baldwin's account of what happened, it simply doesn't

7   add up to the injury that she suffered or how she was found and

8   the fact that her clothing was laying on the grass in the area.

9   And given her past history of covering up or trying to make

10  sure her husband doesn't get in trouble, I suggest that that

11  testimony is simply not credible.

12      The recommendation from Pretrial Services is that the

13  defendant be detained.  This is a presumption case.  These

14  involved crimes of violence.  And, again, he's got a history of

15  assaultive conduct.  He's got a history of convictions for it.

16  He's got a history of police intervention along with

17  threatening police officers.  He just simply presents too great

18  a threat to the community to be released as we're awaiting

19  trial in this matter.  So we ask that the Court adopt the

20  recommendation of Pretrial Services and order the defendant to

21  be detained.

22      I would also ask that the Court impose a no-contact

23  provision as well with either of the victims.

24      *THE COURT:*  No contact with his wife?

25      *MR. LOCHNER:*  Correct, Your Honor.

1            *THE COURT:* Do you have any authority for that?

2            *MR. LOCHNER:* I don't know that there's any authority

3 to the contrary. In almost every single domestic violence-type

4 scenario the person you're talking about is either somebody who

5 has lived together as their partner or their spouse.

6            *THE COURT:* Not when they want to have contact with

7 each other.

8            *MR. LOCHNER:* I don't think -- I don't know that

9 that's true, Your Honor.

10           *THE COURT:* All right. I'm going to -- I'm going to

11 request briefing on that. But Mr. Numinen?

12           *MR. NUMINEN:* Well, Mr. Lochner talks about a history

13 of violent conduct. Admittedly when I look at that pretrial

14 report there is some in the past. There's nothing -- there's

15 recent violent conduct.

16           *THE COURT:* Wait, there's an arrest for assault,

17 resisting an officer in 2015. There's assault with a deadly

18 weapon in 2011 and resisting an officer. There's domestic

19 assault in 2006. There's assault and battery in 2004 and

20 resisting an officer. I can go farther back, but those are the

21 records I have.

22           *MR. NUMINEN:* There are allegations. There are

23 charges. I'm looking at convictions. Anybody can be accused

24 of and even arrested of various things, but when I look at this

25 report from 2000, I see those charges that the Court just

referenced as being dismissed.

There was the assault with a deadly weapon in 2011 five years ago.  My client was put on a delay of sentence --

THE COURT:  Mr. Numinen, let me ask you, you've been practicing criminal defense for quite a while.

MR. NUMINEN:  Yes.

THE COURT:  Have you ever seen anybody arrested this much for assaultive behavior?

MR. NUMINEN:  You know, Your Honor, in the tribal courts --

THE COURT:  In Chicago.

MR. NUMINEN:  On the other hand, people can be arrested, they can be charged, but it is also telling that when you look at the number of dismissals he's had, you wonder perhaps this is a person who is being targeted by various political factions from time to time.

In any event, I think what we need to be looking at is not what he's been accused of but what he's been convicted of.

THE COURT:  No, what we have to be looking at is are there conditions I can release him on that's going to assure the safety of the community and specifically of his wife.

MR. NUMINEN:  And I'm going to get to that right now because I do believe there are conditions.

First of all, I also think that the Court needs to

1    take into consideration the weight of the evidence against my

2    client and the likelihood of conviction or not conviction too.

3    That's something the Court can consider.

4           You've got an allegation of domestic violence that

5    was first brought in tribal court.  Evidence was presented in

6    tribal court that Ms. Pete-Baldwin had suffered from a stroke.

7    And as an offer of proof, I can tell the Court that

8    Attorney McDonald represented my client, that evidence was

9    produced, those charges were dismissed.  As she's testified to.

10           *THE COURT:*  When were they dismissed?

11           *MR. NUMINEN:*  A few weeks ago.

12           *THE DEFENDANT:*  On August 31st.

13           *MR. NUMINEN:*  August 31st.

14           *THE COURT:*  And why wouldn't that presume that they

15    dismissed them when they knew the federal government was taking

16    them?

17           *MR. NUMINEN:*  My understanding, both from talking to

18    Ms. McDonald and from my client and from Ms. Pete-Baldwin, they

19    were dismissed when they produced medical evidence of a stroke.

20    And her testimony, or the testimony that she would have given,

21    was the pictures look bad, but those pictures are also

22    perfectly consistent with a person who described having a

23    stroke, just as she did.  Things were going black, her arms

24    hurt, she walked into a wall, fell over a railing, hit

25    concrete.

*THE COURT:* How did her clothes get torn off?

*MR. NUMINEN:* As she described. Somebody in fact -- in fact, I think my client reached to grab her as she was going over, she flipped over, and he's holding the clothes, and she went over the railing. There's no assault here. These -- the facts that are presented are equally consistent with a version of this she suffered a stroke, which is a traumatic event. What she said to the FBI afterwards and what she is testifying to here is consistent with that version of the event.

And when we look at then the conditions that would assure the two things, the safety of the community and the defendant's appearance in court, we also look back at the history and see that in the delayed sentence that he received in 2011, five years ago, he completed that delayed sentence successfully. Those charges were dismissed. In 2015, the very last incident that he had, he was put on probation, he completed the probation without any violation. The evidence before the Court right now is I believe that he's never had a failure to appear in court for a violation of any probation. And the testimony of his partner of 26 years is consistent with that.

They are going to leave the reservation as soon as he's released. They have a house waiting for them in Bruce Crossing. And it's the hope of Mr. Baldwin and his wife --

1      THE COURT:  Mr. Numinen, I'll tell you right now I've

2  got probable cause he assaulted this woman.  I find her

3  testimony incredible.  I believe she's a victim of domestic

4  violence and she's now withdrawing these charges because she

5  wants her husband back.

6          Under the best of circumstances I will not release

7  him to live with her.  So you're going to have to come up with

8  a different alternative.

9      MR. NUMINEN:  The house at Bruce Crossing is

10 available for Mr. Baldwin to move into.  Mrs. Baldwin and the

11 children are able to make other arrangements.  They thought

12 that they could go back to that house together.  He could go

13 there.  And if that's not appropriate, he could get an

14 apartment right here in Marquette County.  And we would --

15     THE COURT:  Does your client have an alcohol problem?

16     MR. NUMINEN:  He does have an alcohol problem.  I

17 think that's pretty clear.  And I think he's acknowledged that

18 alcohol problem.

19     THE COURT:  Does he get violent when he drinks?

20     MR. NUMINEN:  I think he has a tendency towards that,

21 yes.

22     THE COURT:  Was he drinking that night?

23     MR. NUMINEN:  He was drinking that night.

24     THE COURT:  Go ahead.

25     MR. NUMINEN:  As a condition of bond, Mr. Baldwin

obviously would be prohibited from consuming alcohol.  He could

be tested on a random basis by probation and supervised.  He

could be subject to immediate arrest in the event that there's

a positive alcohol test.

He would agree to reside here in Marquette County so

that he's immediately available to Pretrial Services and

Probation.  So there are conditions.  There's certainly

conditions that would not only ensure his reappearance in court

but also be sufficient to protect the community.

And I'll also just say, when I look at this and I

consider other cases historically that I've had -- I've had

what I think are much worse situations where we've been able to

have bond conditions that allow for my client's release.  I

think we can do the same in this case, and I'm asking the Court

to grant a bond on whatever terms and conditions the Court

finds necessary.

THE COURT:  Tell me a little bit more about this

audiotape.

MR. LOCHNER:  The audio recording right here?

THE COURT:  Yes.

MR. LOCHNER:  Like I said, they were -- the FBI

actually went over on the 13th of August, which was one day

after Ms. Pete-Baldwin had regained consciousness, and they met

with her and spoke to her for about 35 minutes or so.  And as I

said, I proffered essentially what the conversation was during

1   the course of that conversation they had.  I would certainly

2   make the CD available for the Court's review, for Mr. Numinen's

3   review.

4           *THE COURT:*  I would like you to make it available for

5   Mr. Numinen's review and for the Court's review.  I want to

6   listen to it, and then I want to give Mr. Numinen an

7   opportunity to comment on it.

8           When do you think you can get that done?

9           *MR. LOCHNER:*  I'm sure I can make a copy of it and

10   deliver a copy of that over to Mr. Numinen by tomorrow,

11   Your Honor.

12           *THE COURT:*  Can you get a transcription?

13           *MR. LOCHNER:*  I might be able to, but that would take

14   a little bit longer to do.  I can't make that estimate because

15   I wouldn't be the person preparing it.  I would be happy to try

16   to have one prepared, Your Honor.

17           *THE COURT:*  Mr. Numinen, I want you to have an

18   opportunity to listen to this, I want to listen to this, and I

19   want to give you an opportunity to respond, so I'm going to

20   leave this in your court.  You're going to tell me when you're

21   ready to file a response.  Your client is going to stay in jail

22   until that time.

23           *MR. NUMINEN:*  Okay.  Thank you.

24           *THE COURT:*  Any other matters for the Court?

25           *MR. LOCHNER:*  Not at this time, Your Honor.

1      **THE COURT:**  We'll be adjourned.

2      **THE CLERK:**  All rise, please.  Court is adjourned.

3   *(Proceeding concluded at 3:09 p.m.)*

4                    *   *   *   *   *

5                          CERTIFICATE

6      I certify that the foregoing is a transcript from the

7   Liberty Court Recording System digital recording of the

8   proceedings in the above-entitled matter, transcribed to the

9   best of my ability.

10      I further certify that the transcript fees and format

11  comply with those prescribed by the court and the Judicial

12  Conference of the United States.

13

14  January 17, 2017

15

16                         /s/ Glenda Trexler
                           _____
17                         Glenda Trexler, CSR-1436, RPR, CRR

18

19

20

21

22

23

24

25

1          EXAMINATION INDEX

2                                              PAGE

3    JOETTE PETE-BALDWIN

4        DIRECT EXAMINATION BY MR. NUMINEN:        14

5        CROSS-EXAMINATION BY MR. LOCHNER:         28

6        REDIRECT EXAMINATION BY MR. NUMINEN:      49

7                    *    *    *    *    *

8              EXHIBIT INDEX

| EXHIBIT | | OFFERED | ADMITTED |
| --- | --- | --- | --- |
| GVT 1 | Photograph | 10 | 13 |
| GVT 2 | Photograph | 10 | 13 |
| GVT 3 | Photograph | 10 | 13 |
| GVT 4 | Photograph | 10 | 13 |

14

15

16

17

18

19

20

21

22

23

24

25